In The United States District Court In And For The District of Delaware

Lou G. Price, Sr.
     Plaintiff,

    V.

Carl Danberg- Commissioner;
Stan Taylor- Former commissioner;
Thomas Carroll- Warden Dcc;
Elizabeth Betty Burris- Deputy Warden;
David Pierce- Deputy Warden II; David K.
Holman- Major; Joseph Richardson-
Investigator/I.A.; Alisa Profaci, MHU/
SHU Staff Lieutenant; Dorene Fields-
MHU Lieutenant; C.O. Bassinger- Kitchen
C.O.; C.O. Harmon- Kitchen C.O.;
Mr. Klein- Food Service Director II;
Michael Knight- Food Service Director I;
"Dan"/CMS Dietician; Louise Desrosiers-
Doctor; Quani Neal- CMS Nurse;
CMS, Inc.; Stacy Shane- Support
Services Secretary; Mike Little- Legal
Services Admin.; Maria Lyons- MHU Law
Library; Timothy Martin- Law Library; Mike
McCreanor- Captain IGC Chairperson; Lisa Merson-
IGC Assistant; DCC and DOC,
       Defendants.

C.A. No. 07-380-SLR

Jury Trial Requested

RECEIVED
OCT 23 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Amended Memorandum of Law In Support of Plaintiff's 1983 And 1985 Civil Rights Complaint (Pro Se)

(1)

# Jurisdiction

Pursuant to Federal Rules of Civil Procedure Title 42, Sections 1983 and 1985 authority is hereby predicated. The instant complaint is based solely and primarily on an assemblage of civil rights violations due to the ongoing and/or past deliberate indifference, negligence, actions or inactions of the Defendants named herein... having harmed and causing future harm to the Plaintiff.

Defendant Carl Danberg is the current commissioner of the Department of Corrections for Del. (assigned to the Post February 1, 2007) and as commissioner he's incumbent to direct and oversee all operations and staff throughout each Delaware prison.

Defendant Stan Taylor was the commissioner until the appointment of Defendant Carl Danberg. Prior to Defendant Danberg's appointment as DOC commissioner, Danberg served as Chief of Staff for Defendant Taylor.

Defendant Thomas Carroll is the Warden

(2)

at Delaware Correctional Center and has been for some relevant portions of this Complaint.

Defendant Elizabeth Betty Burris is Deputy Warden at DCC and serves as Chief Operational Manager. She substantially contributed to the violations asserted in this Complaint.

Defendant David Pierce is Deputy Warden II at DCC-Smyrna. He oversees the exclusive operations of the SHU and MHU which are designated higher security areas at DCC.

Defendant David K. Holman is Major at DCC-Smyrna. He is supervisor of the security staff in the MHU and SHU areas of DCC respectively.

Defendant Joseph Richardson is the Internal Affairs/Departmental Investigator at DCC for both staff and prisoner-related matters that threaten the safety and security of DCC.

Defendant Alisa Profaci is the MHU Staff Lieutenant. She is the immediate supervisor of/over all staff in the MHU/SHU areas. She substantially contributed to the violations asserted in this Complaint.

'Defendant <u>Dorene Fields</u> is the 4 p.m. to 12 a.m. lieutenant designated to the MHU on a regular basis. She is supervisor to all security staff including but not limited to sargeants, corporals, and inferior correction officers in general.

Defendant <u>C.O. Bassinger</u> is a corrections officer designated as a Food services officer. She oversees inmate Food service workers in the MHU Messhall.

Defendant <u>C.O. Harmon</u> is a corrections officer designated as a Food services officer. She oversees inmate Food service workers in the MHU Messhall and she's in charge of dispensing the regular meals and that includes the [special diet] meals.

Defendant <u>Michael Knight</u> is Food Service Director of <u>Kitchen 1</u>. The Kitchen C.O.'s are inferior employees ranked under him.

Defendant <u>Mr. Klein</u> is Food Service Director of <u>Kitchen II</u>. The Kitchen C.O.'s are inferior employees ranked under him.

Defendant <u>Quani Neal</u> is a nurse who's an employee for CMS, Inc., the contracted medical provider for Del. DOC. Quani Neal is designated to the MHU areas where her duties include medical care and medication dispersing, sick-call care, etc.

Defendant <u>Correctional Medical Services</u>, Inc. is the corporate medical provider for Del. DOC., the employer for the medical personnel at Dcc. They make and/or enforce medical and/or Dcc Policy regarding medical treatment of inmates at Dcc and their personnel follows company departmental procedures.

Defendant <u>Dr. Louise Desrosiers</u> is a medical doctor employed by CMS, Inc., here at DCC who works between the MHU and SHU areas. Her duties, in part, are providing medical care, writing prescriptions/orders for meds, x-rays, consults, special diets, and as a physician she's superior to other medical staff/nurses she works with.

Defendant <u>Dan</u> is the Dietician for CMS, Inc. He's responsible for the dietary needs/restrictions of DCC inmates, including special medical diets or allerginic restrictions.

Def. <u>Stacy Shane</u> is assigned as the Secretary of Support Services at DCC.

Defendant <u>Timothy Martin</u> is assigned as a paralegal in the Main Law Library at DCC.

Defendant <u>Maria Lyons</u> is assigned as a paralegal in the MHU Law Library at DCC.

Defendant <u>Mike Little</u> is the Legal Services Administrator at DCC. He's the supervisor over all paralegal/law library employees at DCC. That includes, but is not limited to supervisory duty of

(5)

the Main Law Library in general population, the SHU Law Library and the SMHU Law Library.

<u>Michael McCreanor</u> is a DOC-DCC Captain who is assigned as the Grievance Chairperson.

<u>Lisa Merson</u> is corporal assigned to assist the chairperson in the Facilitation of the grievance board's operations.

The Plaintiff Lou Garden Price, Sr. hereby submits and asserts that the above named Defendants are being sued in their <u>official</u> and <u>individual</u> capacities. Plaintiff further asserts that the above named Defendants acted in complicity with each other, DOC Policy/Customs, and or at the behest of the administrative body of State Defendants above, or on their own, which, in effect, contributed to the gross civil rights violations of the Plaintiff. Thus, the Plaintiff humbly prays that this Honorable Court grant a <u>preliminary injunction</u> against the Defendants pursuant to Federal Rule 64 of the Civil Procedure until disposition of these proceedings are final.

# Statement of Claims

#1). Defendant, Stan Taylor while acting as commissioner of DDOC deliberately in violation of the Delaware bidding laws signed with a medical provider that has consistently demonstrated a reckless disregard for DDOC residents' health. This same medical provider has had — at the time of commissioner's signing — a long history in the State of Delaware (and the nation) as having failed to render adequate/ effective health care to prisoners. The injuries suffered from the medical incompetence by CMS, Inc. and their employees, Plaintiff contends, is directly attributed to the ex-commissioner's indifference to the laws that govern bidding and that of residents' health. This negligence is what led to the endless array of Eighth Amendment violations to the United States Constitution by CMS and DDOC/DCC.

#2). Defendants Taylor, Carroll, Burris; Pierce set up a system of inmate grievances which impedes the right of due process of law by deliberately appointing staff which Defendants knew did

(7)

not qualify for the position and who dozens of residents of DCC — including Plaintiff — and the public, have alleged in the past and present, may have destroyed grievances. In order to hinder prisoners who wish fair and civil resolutions of their issues through IGC procedures, the Defendants set up a corrupt system for which resolutions sought could never be obtained by prisoners within DCC. Therefore the entire IGC system is futile for the Plaintiff or anyone else to use. Marvin v. Goord, 255 F.3d 40, 43 (2d Cir. 2001); Rahim v. Sheahay, 2001 WL 1263493 at 6-7 17.3; (N.D. Ill.; Oct. 19, 2001); Riley v. Brown, 2006 WL 1722622 at 9 * D.N.J. (June 21, 2006). Section 1985 violations.

#3). Defendants Lieutenant Dorene Fields, C.O. Bassinger, C.O. Harmon working in an arbitrary and capricious conspiracy with CMS Nurse Quani Neal and Doctor Desrosiers, deprived plaintiff and several others of their doctor-prescribed medical diets. A move that was clearly initiated by Lt. Fields (who's supervisor is Staff Lt. Alisa Profaci) due to her deliberate indifference to the serious medical needs of prisoners,

violative of the protections provided by the 8th Amendment as well as the deprivation of civil rights — equal protection of the laws. See Title 42 Section 1985, Conspiracy To Interfere With Civil Rights. By the action (and inaction) of those individuals mentioned above — Fields, Bassinger, Harmon, Holman, Profaci, et al. — For purposes of depriving the plaintiff of substantial civil rights, they entered into a conspiracy that placed plaintiff's health and welfare at serious risk now as well as in the Future. See Helling v. McKinney, 113 S. Ct. 2475 (re: future health problems).

#4). Defendant Shane, the Support Services Secretary entered into a conspiracy with DCC Administration that impeded upon Plaintiff's right to access of the Federal Court in case # 05-871-SLR. Stacy Shane deliberately attempted to sabotage Plaintiff's case by confiscating Plaintiff's "evidence" — news articles collection from The News Journal's (Del), six-month investigation into DCC and CMS' deadly practices. Daily articles entitled "Delaware's Deadly Prisons". Plaintiff charges that Shane deprived Plaintiff his civil rights' equal protections of the law by her actions and she also committed the criminal offense of obstruction of justice and, under instruction by Dcc Admin.,

intimidated him through their retaliation efforts
and destroyed/illegally confiscated his property
with no due process (no Form #537-A...
Confiscated Property Form). Plaintiff has established
a record of these acts in letters, grievance
and in his complaint before this Honorable
Court. These are also violations of Title 42
U.S.C.A. § 1985 (2) Obstructing justice and intimidating
party and; (3) Depriving persons of rights or
privileges. (Note: Further, more detailed, retaliation
and § 1985 conspiracy claims against the above
Defendants and captioned Defendants will
be explained below).

#5). Defendant(s) Mike (or Michael) Little and those
previously captioned have been dostructing Plaintiff's
access to the courts by not providing access
to the law library, or to those trained in the
law and meaningful time needed to obtain
assistance in the preparation of important
documents, research, the policies/procedures of
Court rules and filing requirements. See Bounds
v. Smith, 430 U.S. 817, 828; (1977). As a result

the Plaintiff has been forced to file ineffectual motions which led to actual injury. See <u>State v. Price Not Reported in A.2d, 2006 WL 3411430 (Del. Super.)</u>; and attachments.

#6). Defendants Carroll, Burris, Pierce, Profaci, and inferior corrections employees/officers beneath them violated Plaintiff's rights under the constitution when they exposed his life to serious injury on April 28, 2007, when his cell block (tier) and his cell was filled with smoke/fumes from an apparent fire. By DCC's LACK OF FIRE SAFETY (smoke inhalation hazard in a building w/ no open windows anywhere, no known warning to prisoners in the case of fire/smoke detection, no visible fire exit map or protocol, etc.) and evacuation procedure failure of/on 4/28/07, Plaintiff's life was exposed to an unreasonable risk of damage, injury and death. Plaintiff along with 46 other men's lives were in danger and many suffered unnecessarily on 4/28/07 and if not for the deliberate indifference

of the defendants and their inferiors
A Tier in Building 23 would not have had
to be _evacuated_ _twice_. Not only was plaintiff
injured by smoke inhalation but due to further
deliberate indifference by the above defendants
the Plaintiff remains at grave risk and
what is surely a dangerous prison condition.

#7). On January 16th, 2007 Plaintiff alerted several
Building 23 C.O.'s to the presence of bad indoor
air, poor ventilation and then he pointed upward
to the dayroom ceilings, and cell vents where
they are literally caked and clogged with thick
layers upon layers of a "carpet like" growth of
a black dirt/dust-like substance. In March of 2007
Plaintiff filed a grievance explaining the above
and he also alerted Staff Lt. Alisa Profaci via
letter that he was coughing up phlegm more
regularly than normal and he attributed it to
the dirty/poor air inside of his living areas.
Plaintiff's grievance went ignored as well as
his letters to Lt. Profaci and absolutely no
action was taken to investigate or resolve
this dangerous prison condition that poses

'an' unreasonable risk of serious damage to the health of officers as well as the Plaintiff's future health. Defendants Carroll, Pierce, Burris, Profaci and Mike McCreanor (IGC), with deliberate indifference, and in violation of the 8th Amendment have exposed and are continuing to expose Plaintiff to this dangerous prison condition. Mr. McCreanor just disregarded Plaintiff's grievance and dismissed it.

8). On March 22, 2007 the Plaintiff filed a grievance after his many complaints to Building staff regarding his toilet flooding and constant spillage of human waste. Sgt. Carter, C.O. Swing. C.O. White, and Sgt. Montgomery were asked by Plaintiff to put in work orders in February 2007 and early March but Plaintiff realized that many of the sewage problems he had were shared by everyone else's toilets except staff's toilets. Whenever the cell next door flushes or the two cells underneath Plaintiff's cell, that human waste comes up in his toilet and there are frequent times when that waste spills out into Plaintiff's cell. When that occurs there exists no immediate resolution by the Block C.O. because they are deliberately indifferent to that type of event.

Exposure to sewage was deemed unconstitutional because it's cruel and unusual punishment to force a human to stay or live in that type of condition, (De Spain v Uphoff, 264 F.3d 965, 977) (10th Cir. 2001). Additionally, when Plaintiff and others have to mop up the waste/flood, there's only one mop on the unit for (44) men to use – on 25 cells – and it is the across-the-board policy/custom for Block CO.'s to disallow anyone the use of disinfectants. Disallowing use of disinfectants during the clean-up of human waste, and allowing everyone to continue to use a severely contaminated mophead is a recipe for disaster to say the least (the spread of waste, deliberately, is irreprehensible). The action and inaction here is a clear claim under the 8th Amendment.

9). On January 15, 2007 Plaintiff filed a grievance regarding messhall cups that were caked inside with a bathtub-like scum. He recognized that every cup – when filled with juice (artificial) or water – had an oily film of some kind floating on top. Plaintiff took a water cup, emptied it and wiped it out with

tissue. Plaintiff immediately knew that the cups had dark decay growing and sticking inside of them. Price (Plaintiff) wrote to Staff Lt. Profaci and told her that there was rot literally growing in the cups and as usual she did nothing so Plaintiff grieved the issue. When Plaintiff grieved the issue he mailed to the IGC the tissues he had used to wipe out some of the decay (to illustrate to chairperson McCreanor what the issue was). Plaintiff even dated each tissue before submitting them. Plaintiff vigorously pursued a resolution to this situation because this is just plain disgusting. Plaintiff has addressed like issues regarding dirty food trays, old or spoiled food, greasy "sporks", spoon-shaking during meals, and the decay/rot/scum in cups/trays — to supervisors and their inferiors but their response is the usual deliberate indifference attitude, answer, or no answer. Many Federal Circuit courts and district courts throughout the United States have held that Inadequate Food and Unsanitary Food Service violate the 8th

Amendment especially when correction officials act or respond with deliberate indifference. Phelps v. Kanoplas, 308 F.3d 180 (2nd Cir 2002), Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cr. 1980); Wilson v. Van Natta, 291 F.Supp. 2d 811, 817 (N.D. Ind. 2003); Drake v. Velasco; 207 F.Supp. 2d 809 (N.D. Ill. 2002).

#10). In violation of Plaintiff's Rights under Section 1985 and pursuant to the constitutional prohibitions under the 8th Amendment, Plaintiff has been experiencing retaliation, and deprivation of medical treatment from a number of Correctional Medical Services (CMS, Inc.) personnel. Plaintiff contends that he has made several complaints to CMS. and DOC superiors regarding the misconduct, actions, inactions, and denial of medical treatment by Nurse Quani Neal over the past year. Neal has clearly — verbally — stated on numerous occasions why she yells at the Plaintiff, denies him the treatment he's sought, and more specifically she has even indignantly said "You call yourself suing me. If it was up to me I wouldn't give you anything you ask for!" Apparently Nurse Neal backed her statement up because over the

(16)

last year or so there has been some very "bad air" between her and the Plaintiff beginning with the ultimate reason why Plaintiff commenced this Action, (the abrupt deprivation of Plaintiff's doctor-prescribed Medical Diet and the realization that both DCC and CMS are not independently retaliating against Plaintiff but they have conspired together to do so). More recently, the Plaintiff has attached a handwritten copy of a grievance he submitted (medical grievance) which explains how Dr. Louise Desrosiers put him on a medication that was discontinued before (back in 2005) due to his bad reaction from it. Well, he suffered another bad reaction from it so he submitted a sick call slip which alerted medical nurses (Quani, etc.) that Plaintiff was "nausea, unable to eat, weary and weak with a severe migraine." Plaintiff submitted that sick call 9/26/07 and was not seen until two (2) weeks later, (that sick call is also attached). This is Quani Neal backing up her threat. The Plaintiff will give more details of this cruel and unusual Punishment below in his summary of argument to the claims he has hereby stated, (including Delay of Medical Treatment).

(17)

# Summary of Argument
## Claim #1:

— The Illegal CMS, Inc. Medical Contract Entered Into By Defendant Taylor And Danberg.

In Helling v. McKinney, 509 U.S. 25, 34-35 (1993) the Supreme Court stated that an inmate need not show an injury to state a claim. id. 509 at 33. But in the Plaintiff's previous claim before this Honorable Court — C.A. # 05-871-SLR — he successfully stated a claim and withstood summary dismissal. Even though that case has not yet gone to trial... here comes the Plaintiff again, out of grave concern for his life, bringing more claims... In this instant case the Plaintiff claims that Defendant Taylor and Danberg deliberately exposed him to CMS, Inc., a medical provider with a deadly history of harming prisoners due to their ongoing morbidly deficient medical

care. See Estelle v. Gamble, 429 U.S. 97, 105-106 (1976).

In the case at bar, the Plaintiff claims that Defendant Taylor and Danberg have entered into an illegal medical contract with CMS, Inc. and under the State of Delaware's bidding procedures CMS, Inc. wouldn't even be allowed to bid on any contract which explains why Defendant Taylor subverted the bidding procedure by awarding a no-bid contract to CMS, Inc. (State's Good Standing Clause).

The Plaintiff strongly desired to establish a litany of exhibits which depicts the sordid history of CMS, Inc. but as Plaintiff established in his Statement of Claims Defendants Shane . . . sabotaged that attempt. Still, Plaintiff contends this: given the "dark history" CMS has for prisoners' health care and all of their past and present violations of prison contracts in DDOC, Defendants Taylor and Danberg should have never entered into a new contract with them, knowing that CMS, Inc. has

not and will not honor the terms of the contract. NOTE . . . :

*In response to Joshua W. Martin III's July 2007 report (he's the State's First independent prison monitor), Danberg was quoted in the News Journal saying:" <u>As long as CMS continues to make strides, I will postpone my decision as to whether we want to bring medical care in-house.</u>"

The Plaintiff has a bevy of problems with Danberg's current decision to <u>keep</u> CMS, Inc. because of their current actions, inactions, and their heavily-ladened history of poor medical care and contemptuous mind state toward the <u>humans</u> they have contracted themselves to treat. The Plaintiff submits for the Court that CMS, Inc. is just another money-hungry corporation who wants to always sacrifice patient health care for profits.

In any event, CMS and their contemptuous-minded personnel have breached not only their contract terms but they've

(20) ꜟ

also breached the memorandum agreement the Defendants entered into with the Department of Justice which states, in part, that medical will screen all written requests within 72 hours. Case in point: the Plaintiff filed a sick-call request on June 2nd, 2007 and was not seen until Thursday July 19th, 2007 by Nurse R. Hyler. Another example is a sick-call request Plaintiff submitted on June 25th, 2007 regarding his HBP related headaches and a newly developed pattern of headache pains — plus the fact that his medications are very harsh to take without his diet →(Dr. prescribed "snack bag"). That sick call request has been totally ignored to date.

CMS, Inc. and their personnel will never honor the terms of their current contract nor will they respect any terms of the current agreement with DOJ (U.S.) because they (CMS) have gotten away with being dishonorable and crooked for so long — nationwide. Their gross pattern

of deliberate indifference to serious medical needs of prisoners is well-known to the Defendants Taylor, Danberg, et al.. Plaintiff emphatically asserts that it is the duty and certainly within the jurisdictional boundaries of this Court to use every pound of its power to do what these morally deficient and money-motivated politicians (Defendants) are blatantly refusing to do ("I will postpone my decision as to whether we want to bring medical care in-house," Danberg said). . . Prisoners—male and female—are dying now.

These are human rights issues and civil rights issues, (violations). (END NOTE). ★

Aside from CMS' refusal to administer adequate medical care, Plaintiff claims that he along with every other man who is seen by medical staff in the SMHU and the SHU is refused medical privacy. The C.O.'s/officers/Sgt. stand inside the room during medical visits — even when a nurse or doctor requests that the Plaintiff expose the "private areas" for inspection. The dehumanizing feelings/effects

(22)

of that is depressing, and awfully humiliating, and certainly unconstitutional. The door is open, prisoners even stand outside or walk by and the windows are not even translucent, they're transparent and crystal clear for everyone to see and hear. There's no confidentiality. That's unconstitutional and unethical and totally against doctor-patient privilege. This even goes for when inmates are being interviewed by the psychological staff. See Woods v. White, 689 F. Supp. at 877 and Casey v. Lewis, 834 F. Supp. 1477, 1546 (D. Ariz. 1993). Nolley v. County of Erie, 776 F. Supp. at 733-34. This Honorable Court is abundantly aware that the disclosure of medical information may constitute the "public disclosure of private facts" which is just one variety of the tort of invasion of privacy in many states. Hillman v. Columbia County 164 Wis. 2d 376, 474 N.W. 2d 913, 919-20 (Wis. App. 1991). Damages have been awarded as a tort of doctor-patient breach in many states too. See Vassiliades v. Garfinckel's Brooks Bros., 492 A.2d 580, 592 (D.C. 1985).

As a general—and acceptable—and encouraged practice, this goes on every time medical staff visits patients. Even if they're not known to be violent or sexual predators. This is the Medium High Unit; Plaintiff asserts that no one here is hand-cuffed/shackled while seeing medical staff (as is the case in SHU).

→ The Agreement Defendants Taylor And Danberg Signed That Waived Plaintiff's And Others' Constitutional Rights to recover for pain and suffering inflicted on them by the Defendants' failure to oversee the prison health care system and make sure the prisoners' health care was being taken care of by CMS, Inc. Moreover, by not providing the Plaintiff and others with a copy of the Department of Justice Findings clearly constitutes an attempt to obstruct justice by limiting the Plaintiff's input of constitutional violations found at

DCC - DDOC at the hands of CMS, Inc. as well as the DOC Defendants. The Plaintiff emphatically contends that he has a right to those <u>Findings</u> because they not only affect him as a resident but as a person who is actively litigating pro-se against the same Defendants who the <u>Findings</u> were based upon.

Wherefore, the Plaintiff humbly requests that this Honorable Court grant a preliminary injunction be entered against Defendants Danberg, Taylor, et al. which would release for review to the Plaintiff the constitutional rights violations found by the U.S. Department of Justice findings of December 29 2006, pursuant to 42 U.S.C. Section 1997 (a)(1), And found at page three (3) of the memorandum agreement... where Taylor and Danberg violated 42 U.S.C.A. § 1985 by confidentially entering into an agreement with the U.S. Attorney General's office waiving constitutional rights of Delaware inmates without notice or consent by Plaintiff, et. al.

## Claim # 2

— The Inmate Grievance Procedure (IGC Policy 4.4) Is A Miasma of Corruption And A Conspiracy Utilized By DDOC—DCC Officials To Deny Prisoner's Rights To Due Process of Law And Boldly Circumventing Access To The Courts.

The Inmate Grievance Committee is another blackhearted move by the Defendants to cover up their dirty, corrupt, ways. It's a system constructed to obstruct justice, deprive prisoners of their civil rights and a system that has led to prisoners' death, pain, and suffering. An outright Section 1985 Conspiracy to interfere with civil rights by its enforcers — the Defendants Taylor, Danberg, Burris, Pierce, Carroll, and CMS, Inc. employees, et. al.

Defendants Taylor, Carroll, Burris and Pierce have orchestrated a system that under-mines the grievance procedure, rendering it

(26)

Problematic at best. The clear language of the established 4.4 Grievance Policy outlines the manner in which grievances are to be handled. Grievances are frequently lost and the grievant told his grievance was never received. Grievances are returned and said to be non-grievable, despite the grievance policy stating that any issue affecting a resident is grievable while so confined. Grievance hearings are rarely held and never are grievances responded to in the designated time frame required by policy and procedure. Some grievances have taken up to eighteen (18) months before any response from the IGC hearing board. Plaintiff has been denied due process and he has presented before this Honorable Court documentation (C.A. # 05-871-SLR) relating to this claim. See attachments which further support these claims. The Defendants, Plaintiff asserts, have continuously undermined the grievance procedure via the haphazard appointment of correctional officers

27 of

June 21, 2006); Marvin v. Goord 255 F.3d
40.43 (2nd Cir. 2001); Rahim v Sheahay, 2001
WL 1263493 at 6-7 A.3; A.D. ILL. (Oct. 9,
2001).


## Claim # 3


— The Above Captioned Defendants Deprived
Plaintiff Of His Doctor-Prescribed Diet
Meals As Punishment For Other Prisoners'
Not Picking Up Their Diet Meals In
Messhall, Violative Of The Protections
In The Eighth Amendment Regarding The
Deliberate Indifference Standard Of
A Prisoner With Serious Medical Needs.


★ PLEASE NOTE that the Plaintiff Filed
with the District Court Clerk Of Delaware
the Following 42 U.S.C. § 1983 Complaint
given C.A. No. 07-380-SLR. Plaintiff — For
the record has attached a copy of that complaint

by virtue of their official and subservant positions to the named [Administrative] Defendants and thus cannot be impartial while trying to serve two masters — one justice, the other co-workers (Administrative co-workers). The entire practice is one that amounts to the deliberate indifference to prisoners with serious medical needs (Note: Medical Grievances are also done under IGC Policy 4.4). There's an unwritten across-the-board policy of denying all grievances that have the potential or likelihood of giving "weight" or credence to any and all possible lawsuits in local, State, or Federal Courts. This, Plaintiff contends, is the Title 42 U.S.C.A. Section 1985 conspiracy to interfere with his (et al.) civil rights to obtain justice.

The below listed cases shed some light on the prejudice and violations that such circumstances can produce. See Thomas v. Woolem, 337 F.3d 720, 733 (6th Cir. 2003); Riley v. Brown, 2006 WL 1722622 at 9 (D. N.J.

and this is an expansion of it. Also, Plaintiff has attached a copy of the request for TRO and Preliminary injunction for the record.

## Facts As To Claim #3:

Due to several serious high-risk factors for heart attack and stroke, the Plaintiff has been on a special diet to prevent the worst from happening (heart attack/stroke). In May of 2007 Plaintiff's special diet was terminated due to Lieutenant Dorene Fields coming around to SMTU Tiers with CMS, Inc's "refusal (treatment) slips" for several people on special diet meals stating that: "if you don't sign I'll sign 'refuse to sign'" (which to me makes it appear that I agreed or refused treatment/my meal which was doctor-prescribed). Lieutenant Fields knew exactly what she was doing. Herself and CMS medical staff conspired to jeopardize my health by terminating my special diet to suit their own depraved purpose which was to punish the men who were taking advantage of the special diet program (if you will).

(39)

<u>Facts</u>

1). On or about May 15th, 2007 I was informed by a SMHU B-Side Kitchen worker that my diet meal has been terminated per CMS - Medical, and DOC Kitchen C.O.'S.

2). Attached is a letter Plaintiff wrote to Investigator Joe Richardson (addressed also to Tom Carroll — Warden —; Deputy Warden Pierce and Deputy Warden Burris). Major Holman was the only one who responded, reprimanding Plaintiff for sending his "medication punch cards" to the administration (which was only meant to demonstrate the type of meds I took and so they could see the "Take With Food" warning labels... I had multiple cards of the same meds so I did not send out <u>all</u> of my meds). None of these individuals Plaintiff complained to took any action to have my diet meals reinstated.

3). Attached to the original complaint is a May 22nd letter Major Holman sent Plaintiff in the mail, via official memo.

(30)

4). Also attached to the original complaint is the letter Plaintiff sent with the meds in which he ~~sent~~ (Holman) back to Price scrawled with the reprimand. It was Lt. Profaci (Staff Lt. Profaci) who gave Plaintiff the meds back. Plaintiff saw the letter attached and appealed to her to reinstate his diet meals — she refused to take any actions on that day (May 18th, 2007.

5). Plaintiff's medications make him nausea which is normal for these type of pain meds (all of which are marked "Take With Food" warnings). They're harsh on the stomach. Inderal (for HBP ; migraine prevention); Motrin (carpal tunnel / cervical joint pain); Excedrin (migraine). Plaintiff keeps those in his cell. The nurse — administered meds are Seroquel and Elavil which are also harsh on the stomach. This is why Plaintiff was prescribed the AM-PM snacks; that way he can safely/comfortably take his meds, plus giving him a 2400 calorie diet.

(31)

Statement of Claim Cont.

7). It is well-documented that I can not tolerate medications well without experiencing stomach pain, nausea, and other side effects. My medical chart clearly reflects this fact because I've been taking the following meds for years:

Zantac (GERD, Acid Reflux Disease/Disorder all my life);

Mintox/Maalox Tabs (to coat my stomach to thwart med pain); (Dc'd)

and    Tums —        "        "        "

8). Eighth Amendment Claim — Cruel Unusual Punishment

Because Lieutenant Fields and other CO's have failed to control a number of individuals in the messhall regarding diet meals I am being penalized. That penalization has caused me several weeks of pain, suffering and it has placed me in future risk of

(32)

heart attack, stroke, and other bad health risks. My Father, his Father, my grandmother, and both of my mother's brothers all died of problems arising out of HBP/Heart Attack/Stroke. (Verify by calling Shirley Price in Bessemer Al. P.o. Box 232, Bessemer Al. 35142 for health history - 205-428-6501). I have High Blood Pressure and I take Inderal to treat it. It causes migraines.

A). I suffer from frequent migraines so I have to take Excedrin/Motrin without Food; esp. at night (and I am over $225 in the hole so I don't ever have canteen/food items to eat). See Financial statements. So I'm forced to endure painful side effects of pain meds.

B). Lieutenant Fields, Lt. Profaci, C.O. Bassinger, Major Holman, Betty Burris, D. Pierce, Tom Carroll, Joseph Richardson, Nurse Quani Neal, M. Knight, Dr. Desrosiers

are all directly involved with my having to suffer from this pain because I either wrote to them, or complained directly to them and they refused to take action regarding

(33)

these issues which constitutes deliberate indifference to Plaintiff's serious medical needs. By refusing (in fact denying) Plaintiff's doctor-prescribed special diet, both CMS, Inc. staff and DOC staff have both entered into an agreement to deny Plaintiff medical treatment sure to lead to a serious health hazard. That's cruel & unusual punishment.

Furthermore, on August 28th, 2007 Plaintiff Filed with the Court A Motion For Temporary Restraining Order AND Also A Motion For Preliminary Injunction based on "new Facts" directly related to this special diet issue. That MOTION is attached.

## Claim #4

DCC's Support Services Secretary Ms. Stacy Shane Illegally Confiscated Plaintiff's "Evidence" Regarding Case # 05-871-SLR; Section 1985 Conspiracy To Interfere With Civil Rights

(34)

And A Clear Obstruction of Justice Claim.

Plaintiff followed DCC's policy on obtaining copies of material that is deemed non-legal (see attached exhibit on copy policy) by sending approximately two dozen "Delaware's Deadly Prisons" news articles to the Business Office with Stacy Shane's name on the package (she had told Plaintiff on another occasion that she would handle copies sent). Plaintiff had sent to Ms. Shane a "pay to" (disbursement of Funds) slip along with his specific request for copies of the news articles which Plaintiff had planned to use against CMS and DCC as evidence in his case C.A. No. 05-871-SLR, in July of 2006/mid-summer. Plaintiff never received his copies nor his articles back from Ms. Shane. Plaintiff wrote to Ms. Shane, her supervisor—Tonya Smith—Counselor Cindy Atallian and finally a Grievance. Ms. Shane failed to reply to

several letters sent to her but she did reply to "other" kinds of letters (i.e. Financial Statement requests, to be specific...) so I knew she was deliberately evading my inquiries. Tonya Smith evaded my letters of appeal to her. My grievance disappeared like so many others. This is when I knew there was a conspiracy going on and that meant I was not getting the news articles back (e.g. Capt. McCreanor runs IGC and Tom Carroll, Betty Burris and Dep Warden Pierce are all connected in one way or another to the IGC process). Plaintiff's Counselor, Cindy Atallian, had wrote a letter explaining the possibility of why Ms. Stacy Shane had not replied which was "Ms. Shane may be taking her vacation time before Summer's end." Plaintiff did not believe that but there was really little he could do. Plaintiff

(36)

has, however, made mention to the Court that he has been retaliated against by DCC officials in several ways, this only being one; his classification to high security without proper due process being another.

Plaintiff hereby contends that Stacy Shane's actions as well as her co-conspirators' actions has dealt a destructive blow to his case (C.A. No. 05-871-SLR) since he has been unable to retrieve those illegally confiscated news articles from The News Journal which he has a right to have. The articles were important to his case in the manner that their content gave clear depictions directly related to his claims in #05-871-SLR of denial of medical treatment and delay in medical treatment and the sick-call policy that violates his 8th Amendment Rights.

(37)

## Claim #5

Defendants Mike Little, Maria Lyons and Timothy Martin (along with their administrative superiors) are guilty of blocking Plaintiff's access to the Courts, reading his legal papers and divulging his confidential legal details to The Department of Justice in Delaware. Also, Plaintiff contends that the above defendants have been working in cahoots with the Delaware Department of Justice and in effect directly and deliberately interfering with his civil rights... the right to have unblocked access to the Courts, which is a violation of the Constitution.

Plaintiff's legal walk has been a journey for lack of a better phrase. Arrested in April 2001 and sentenced to a state term in Pennsylvania, he was later brought to Delaware on Executive Agreement between Governors (arrived in Delaware January 2002 to face murder charges). After his conviction in May 2003 Plaintiff was under the impression that he'd be automatically returned to Pennsylvania but he learned that the Executive Agreement by Pa. ; De. Governors was not totally legitimate so Plaintiff filed a State Habeas Corpus in Superior Court of

(38)

Delaware. The Court, finding it meritable, granted the Motion to return to Pennsylvania one Lou G. Price, Sr. ASAP. Five months later Plaintiff was back in Pennsylvania (July 2004). September 2004 the State of Delaware's Supreme Court rendered a ruling on Plaintiff's Direct Appeal — "Affirmed". Being Pro Se, Price wrote several letters (dozens) to his former attorney, De. Superior Court and the NCCo prothonotary/De. to attempt to procure discovery and transcripts related to his case but to no avail (obtaining De. Law/R-61, etc., in Pennsylvania DOC proved to be nearly impossible). Price received letters back from De. Superior Court saying that they could not assist him and Price received no noteworthy responses back from his former attorneys either and Price knew that his time on collateral was running and would expire September 2005, a year from Sept. 2004 (when the direct appeal decision came out), which would endanger his Federal Habe (if needed).

Fortunately, Plaintiff Price was brought back to Delaware after making Parole in Pa. DOC because August 2005 he had hastefully filed a Rule 61 Motion approximately (12) days before the carpal tunnel surgery (Price knew if he did not file it, any chance of later filing a Federal Habeas would be barred by this Court). Needless to say

(39)

the Rule 61 Price Filed was a complete disaster so when he came to Delaware he petitioned the Superior Court to extend his time to Amend it. Plaintiff was granted time to Amend on (3) different occasions. During that time, Price was still trying to procure his case File/discovery from former counsel. In May of 2006, while in the DCC Infirmary for a dislocated Finger and evaluation, Joseph M. Bernstein, Esq. Fed Ex'd an 18 pound box to Plaintiff just a couple of weeks before Price's Rule 61 was due in Superior Court, ( the Court had specifically declined any more extensions). Keeping the suspicions silent Price was forced to once again File a Frivolous Rule 61 Motion which of course was <u>denied</u> by Superior Court, and even though the court never even reached the merits of Price's claims he was told that he was procedurally barred.

The Facts are, Price was housed in Building 21/Maximum Housing as a result of him "forcing" the State via State Habeas to send him back to Pa. DOC. Before he left Delaware in 2004 Price had been housed in general population in D-Building. Then the situation on September 21, 2005 with the transferring officers (05-871-SLR)

(40)

and CMS/Nurse Kozak, the administration decided
to place Plaintiff in Maximum Housing. In doing
so DCC officials violated Plaintiff's rights to have
access to the Courts because all there was
was a mailing system in place which Plaintiff
knew nothing about because DCC has no orientation
custom here which would have told him so. Also,
Plaintiff contends that the actions of DCC officials
(defendants above) were retaliatory in nature." Because
the Constitution protects an inmates access to the
Courts, prison officials may not retaliate against
those who seek or obtain such access — whether
the retaliation takes the form of withholding
property or privileges does not matter." Please see
De Tomaso v. McGinnis, 970 F.2d 211, 214 (7th Cir. 1992); accord,
Williams V. Meese, 926 F.2d 994, 998 (10th Cir. 1991)(job denials
and transfers); also see Madewell v. Roberts, 909 F.2d
1203, 1206 (8th Cir. 1990)(blocking reclassification opportunities,
worsening living, and working conditions). Plaintiff did
nothing to justify placement in maximum housing
on 9/21/05. Plaintiff contends that since he was
classified to general population before his out-
of-state transfer to Pa.-DOC then he should
have been classified back to general population
once he'd returned to Delaware. Stopping in mid-
stream and changing Plaintiffs classification

(41)

status with virtually no justification is an abuse of discretion and if it's because of the unfortunate rape of that counselor in 2004 (July) where DCC got exposed to the public for their internal "flaws" — Plaintiff had nothing to do with that. That was DCC's neglect but even if they alluded to the fact that Plaintiff Price was convicted in a murder case — so were dozens and dozens of other prisoners at DCC who have never even seen the SHU or SMTU. Plus, Price has no violent disciplinary history (no fights, no violence against staff, no escapes, etc.). So, DCC's only reason for placing Price in SMTU since 9/21/05 is to retaliate against him for the reasons stated herein. Thus, providing DCC had justifiable reasons to place Price in high security, the due process clause mandates that Price is given reasons why — in writing — that he was denied because of this reason or that reason. Not one reason was given.

Further, Plaintiff has brought it to the attention of this Court that Maria Lyons (DCC Staff Paralegal) is guilty of divulging confidential information to Mike Little who provided them to the Department of Justice DAG Erika Y. Tross, Esq. (See attached

(42)

"Law Library Usage: Lou G. Price #454309"). The law provides that prisoners are entitled to unobstructed and confidential communication with courts, and with attorneys, and their assistants. And this right "is not limited to those already represented by an attorney, but extends equally to prisoners seeking any form of legal advice or assistance." See Procunier v. Martinez, 416 U.S. 396, 419, 94 S.ct 1800 (1974); see Foster v. Basham, 932 F.2d 732, 734-35 (8th Cir. 1991). Procunier v. Martinez 416 U.S. at 419-22; Ex parte Hull, 312 U.S. 546, 549 61 S.ct. 640 (1941) where prison officials were outlawed from screening prisoners submissions to court. Also see Ruiz v. Estelle 503 F.Supp. 1265, 1372 (S.D. Tex 1980) . . . 679 F.2d 1115, 1153-55 (5th Cir 1982). Defendant Lyons apparently is exempt from the screening ban.

Further, "regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." Procunier v. Martinez, AND [remember] "Because the Constitution protects an inmates access to the Courts, prison officials may not retaliate against those who seek or obtain such access..." (as Plaintiff quoted before above). The point to be nailed here is that the defendants

(43)

are doing and have done just that. This is why
Plaintiff has emphatically noted that he has been
retaliated against and by practice [and otherwise
mentioned] he has been denied access to the
courts. And even though he's been in the SMHU
(Shed High Unit) he was allowed to "physically attend"
law library but that was stopped in December
2006 due to a personnel change and/or decision
of some sort. But even then, Plaintiff was not
allowed to meet with nor discuss how to file
meaningful motions or court papers as outlined
in Bounds v. Smith and its progenys (NOTE: in
general population's (Main Law Library, prisoners
have consistent access to inmate paralegals for
meaningful legal assistance in how to proceed
in the courts but here in the SMHU inmates
are not allowed to meet with inmate paralegals).

      This court has jurisdiction over this type
of matter... The law holds that such actions
may be remedied by an injunction even if
the practices are not formally part of official
policy—see Ruiz v. Estelle, 679 F.2d 1115, 1154 (5th Cir. 1982),
cert. denied, 460 U.S. 1042 (1983); Pratt v. Rowland, 770 F. Supp.
1399, 1406 (N.D. Cal. 1991),— OR these sort of actions
may be remedied by an award of damages,

(44)

see Coleman v. Turner 838 F.2d) 1004, 1005 (8th Cir 1988); Lamar v. Steele, 693 F.2d 559, 562 (5th Cir. 1982); Cruz v. Beto 603 F.2d at 1181.

Plaintiff accuses the defendants of reading his legal papers, letters to lawyers/judges/etc. and divulging confidential matters to the Delaware Department of Justice DAG Erika Y. Tross and everyone (incl. CMS) associated with her/department. Plaintiff is alarmed that all the Dept. of Justice has to do is make one phone call to Doc and they know everything Im doing legally. This is not a simple or frivolous claim that a state court would handle. The accusation is so profound in nature because Plaintiff is involved in a crucially essential pending appeals process. Specifically, defendant (paralegal) Maria Lyons gave Mike Little a detailed computer printout of everything Plaintiff Price has been doing in the law library. Everything — even the exact number of copies, page by page. (Attachment).

Price does not have to inform the Court that this is an "adversarial process." The integrity of that process is protected by the Courts but it has been breached. The law is that prison staff may not read prisoners legal papers. Plaintiff contends that the law affords him this protection for reasons such as this. Even if legal papers are

(45)

read in circumstances such as during or after cell searches is also unlawful. Bayron v. Trudeau, 702 F.2d 43, 45 (2d Cir. 1983) (allegation that guards read legal papers during a search stated a constitutional claim); also see Franklin v. State of Oregon, 662 F.2d 1337, 1345 (9th Cir. 1981) (same situation). This system (DC's) cannot be okay. Plaintiff alleges misconduct by the Dept. of Justice too.

Plaintiff has alleged retaliation for his legal activities and he understands that the burden of proof is on him. "Some courts have suggested that you must prove not only that your litigation played a part in the action that was taken against you, but that it would not have happened at all except for your litigation." Ponchik v. Bogan 929 F.2d 419, 420 (8th Cir. 1991). Further "he must have concrete evidence to support the claim". Jackson v. Fair 846 F.2d 811, 820 (1st Cir. 1988); Howland v. Kilquist, 833 F.2d 639, 644 (7th Cir 1987). What is more concrete than the computer printout itself? (which was attached as an exhibit to a Motion To Deny Counsel Filed in the District Court of Delaware by Ms. Erika Tross, Esq. in the Civil Division?) As for the other claims of retaliation the law affords to the Plaintiff that this burden of proof may be met by circumstantial evidence such as the time sequence of his legal action and the alleged retaliation. See Smith v. Maschner

899 F.2d 940, 947-49 (10th Cir. 1990); Harris v. Fleming, 839 F.2d 1232, 1236-38 (7th Cir. 1988).

All of the above retaliation claims have in fact occured during and as a result of Plaintiff filing actions in the courts (Superior Court Habeas; District Court 1983; C.A. #05-871-SLR and #07-380-SLR). The time sequence is in exact step with the retaliation claims.

## Claim #6

As noted in his statement of claims, Plaintiff alleges that Defendants Carroll, Burris, Pierce, Profaci and their inferior corrections employees violated Plaintiff's rights under the Constitution when they exposed his life to serious injury on April 28, 2007 when his cell block and cell was filled with noxious smoke and fumes from an apparent fire. From the moment prisoners on the cellblock began to bang on their cell doors, begging to get out, yelling "Fire! Fire!" there was a lapse in fire safety as demonstrated by the C.O.'s. But they did alert Lieutenant Dorene Fields who ordered the (49) prisoners to be led into the small attached recreation area outside the block (A Tier 23 Bldg). Plaintiff does not name the block C.O.'s as defendants because not only were they new to the job but they were unwilling

(47)

participants to the "shots Lt. Dorene Fields" was calling. When the C.O.'s failed to locate the source of the smoke/fumes Lt. Fields ordered that everyone be strip searched in the (4) showers which face the windows/control booth and dozens of C.O.'s (male/female) who milled about. Also, prisoners could see each other get <u>stripped</u> <u>naked</u> because the yard windows were just yards away from the downstairs shower stalls. Plaintiff felt humiliated and dehumanized by this emotionally abusive experience. Especially when he was made to stand barefoot on the wet, slimey shower floor as he was strip searched. Lieutenant Fields and another lieutenant (unk.) were upset that someone had started a fire and to punish the prisoners this is what they did. Then, when nothing was found on anybody, all (49) men were ordered back into their cells which still had the pungent fumes inside of them.

<u>Deliberate Indifference</u>.

The entire block and every cell still had the noxious smoke/fumes in them and Plaintiff (everyone) was locked in. Lieutenant Fields could have left everyone in the yard but to punish everyone for one person's "foul up", all were

(48)

Forced to inhale the carbon monoxide/Fumes that were circulating in the ventilation system to each cell. Mercifully the C.O.'s apparently complained and/or suggested that the doors needed to stay open to "air the block out" so 45 minutes after we were locked in we were evacuated once more to the messhall where dinner was served. Plaintiff and many others were so nauseous that we didn't eat. Couldn't eat. After we sat in the messhall the official order came down to keep us in the messhall because the fumes were so strong that it would take time to air the window-less block out (e.g. the side door is never opened in the presence of inmates and the windows do not open).

After that took too long we were ordered into the gym. While in the gym (finally) a list was taken to see who needed to be seen by medical staff. Plaintiff saw that the men who were asthmatic were noted to be seen first. In all we were away from the block for more than or apprx. (2) hours. The fact is we had to be evacuated twice and this was not mere negligence

(49)

'it was deliberate indifference (review the key facts). The Constitution requires prison officials to provide "reasonable safety" for prisoners. Helling v. McKinney U.S. 113 S.Ct. 2475, 2480 (1993). Lt. Fields failed to do that because if there was/is a fire safety procedure in place she not only failed to use the knowledge, skill, and care expected of her profession but she chose to deliberately disobey it. Plaintiff has established the prerequisite showing that a supervising prison official displayed "deliberate indifference" and "reckless disregard" for safety by failing to "act reasonably" in response to danger. Farmer v. Brennan U.S. 114 S.Ct 1970, 1978-84 (1994); accord, Goka v. Bobbitt, 862 F.2d 646, 651 (7th Cir. 1988) (the Constitution is violated "where defendants know of the danger or where the threat of violence is so substantial or pervasive that their knowledge could be inferred, and yet defendants fail to enforce a policy or take other reasonable steps which may have prevented the harm."). And in 8th Amendment cases, Plaintiff's must show that prison personnel "knew of and disregarded an excessive risk to inmate health or safety..." Farmer v. Brennan 114 S.Ct at 1979. Plaintiff has shown this requirement. The actions of Lieutenant Fields, after the strip search, fully establishes an 8th Amendment case when she locked or ordered that (49) inmates be locked back into cells that

(50)

still reeked badly of noxious smoke/fumes for approximately (45) minutes. In fact, so bad that all (49) inmates were made to evacuate for the <u>second time</u>. And even though many men, including Plaintiff, complained of headaches, nausea, burning eyes and dizziness, no one was seen by the medical nurse until several hours later, (night time). Not even the asthmatics. The fire was at appx. 3 p.m. and no one seen the nurse until about 9 p.m. (Note: it was <u>C.O. Darden</u> and a Sgt. <u>Dymoski</u> who alerted the other officers of fire. I may have misspelled "Dymoski"). Plaintiff filed grievances which were shot down and the policy provides no steps for appeals when the IGC chairperson (Cpt. McCreanor) does not allow it to go through so once again the IGC process is futile. <u>See Complaint #2</u>. Also see <u>Hadix v. Johnson</u>, 367 F.3d 513, 525 (6th Cir. 2004); <u>Hoptowit v. Spellman</u>, 753 F.2d 779, 784 (9th Cir. 1985); <u>Gates v. Collier</u>, 501 F.2d 1291, 1300, 1305 (5th Cir. 1974).

See attached affidavit(s), and grievance.

(51)

## Claim #7

On January 16th, 2007 the Plaintiff wrote a letter to Lt. Profaci regarding the bad air/poor ventilation inside of the SMtu. She ignored that complaint so Plaintiff spoke to the Block C.O.'s (Sgt. Carter & C.O. Passley). Plaintiff decided to write a grievance on March 21st, 2007 after Profaci ignored his complaint (Plaintiff's). (The grievance is attached).

Plaintiff complained that the ceilings, cell vents, and dayroom vents are literally caked with a thick growth of black substance that could only arrive from the air. Plaintiff requested simple action from Lt. Profaci and the IGC who simply ignored/shot down his grievance. Plaintiff has been in the SMtu areas for (2) years now and he told Profaci and the IGC that he coughs up phlegm more than normal and they did nothing still. The Plaintiff began thinking that these conditions would harm his future health such as cause cancer in his and others lungs. Plaintiff

realized that For DCC Administrators/officials to see the problem and do nothing to Fix it constitutes cruel and unusual punishment which the 8th Amendment prohibits. They see what Plaintiff sees plus the Plaintiff has put the complaints in writing and they chose to ignore it. And, like in Claim #6, it should be abundantly clear that there's inadequate ventilation in Building 23 - A Tier. See Board V. Farnham 394 F.3d 469 (7th Cir 2005); Keenan V. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996); Ramos V. Lamm, 639 F.2d 559, 569-70 (10th Cir 1980). Plaintiff emphasizes the point that there's poor ventilation inside of Bldg. 23/MHU and the Indoor Air is horrible which is evident by looking at the vents on the ceiling outside of the cell, in the showers, and in the cells. There's no telling what types of pathogens have damaged Plaintiff's, prisoners, and staff's lungs. This is everybody's problem.

(53)

## Claim #8

Over the course of the past (7) months, the Plaintiff has had to clean up raw sewage in his cell approximately (30) times due to his toilet either leaking out or being stopped up (where nothing will go down and one flush causes a flood). Plaintiff filed grievances that were never answered but he filed one that he made (2) hand written copies of (attached). Plaintiff alerted Sgt. Carter, C.O. Swing, C.O. White, and Sgt. Montgomery to put in work orders in February 2007 and at other times but many of the sewage problems he had were shared by everyone elses toilets except staffs toilets. Sadly, Plaintiff learned, inmates are so exasperated by the deliberate indifference at DCC that complacency is <u>urged</u>... Whenever the cell next door flushes or the two cells below/above flushes, human waste rises up in Plaintiff's toilet and there are frequent times when that <u>waste</u> floods

(54)

out into Plaintiff's cell. There is no immediate resolution by the block C.O. other than putting in a work order if they don't have the toilet "Snake". Frankly, they don't care and because the CO.'s know they aren't supposed to leave inmates in a cell with a broken toilet they threaten to have the inmate(s) moved which is not an ideal experience because they might (inmates) be sent to the "SHU" (max) and property is lost so most men "suck it up" and "tough it out". Sometimes an old towel or T-Shirt being stuffed down in the toilet may unblock/unclog the pipe but that's extremely nasty. In such a situation (and during cell cleanup) inmates don't have gloves or disinfectants so we're forced to stick our hands in urine/feces, etc. Per order of Lt. Profaci and enforced by building C.O.'s, we don't get to use disinfectants which are supplied weekly but the "E-Crew" worker gets to use them on the C.O. bathroom, the floors, the control room ("bubble") windows, walls, etc. DeSpain v. Uphoff 264 F.3d 965, 977 (10th Cir. 2001) and like

(55)

Court decisions have long prohibited acts or situations that force prisoners to be exposed to human waste/exposure to sewage. Additionally, Plaintiff has witnessed or been a part of having to use a contaminated mop (human waste or even blood) which is passed between 25 cells (or 49 men). The same mop is used in the showers, the dayroom and each cell which one can say "cells are actually bathrooms used by two men." So, in effect, a mophead with feces, urine, blood, and shower grime on it is being used by (25) cells / 49 men, spreading lord knows what types of diseases. Plaintiff has seen C.O.'s and Sgt.'s physically put what they call a "soap ball" into a mop bucket and allow everyone to use that same bucket/mop and say "no" to requests of more "soap balls"(disinfectants). These acts are irreprehensible claims under the 8th Amendment.

(56)

## Claim #9

On January 15, 2007 the Plaintiff Filed a grievance regarding messhall cups that were caked inside with this "bathtub-like" scum. He realized that every cup—when filled with artificial juice or water—had an oily film of some kind floating on top. Plaintiff took a water cup, emptied it and wiped it out with tissue. Plaintiff immediately knew that the cups had dark decay growing and sticking inside of them (like the inside of a fish tank has that greenish gook). Price has taken numerous steps to eradicate this problem. He wrote Lt. Profaci, he wrote a grievance which IGC Chairperson once again dismissed by saying "Kitchen is inspected regularly by the board of health." Plaintiff has addressed like issues regarding dirty food trays, old or spoiled food, greasy spoons/sporks, the "spoon-shaking" of food during meals (giving "short" food) and the decay/rot/scum in the cups and trays. The response is the usual deliberate indifference

(57)

attitude answer or no answer. Many Circuit courts have held that Inadequate Food and Unsanitary Food Service violates the 8th Amendment, especially when correction officials act or respond with deliberate indifference. No good can come out of placing peoples health in or at risk of developing food poisoning or something worse. See Phelps v. Kanoplas, 308 F.3d 180 (2nd Cir. 2002); Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir 1980); Wilson v. Van Slatta, 291 F.Supp. 2d 811, 817 (N.D. Ind. 2003;) Drake v. Velasco, 207 F.Supp. 2d 809 (N.D. Ill. 2002), Plaintiff states that the unsanitary food practices by Dcc have been and are currently placing him at serious health risks — now and for the future. (See attachments).


Claim #10


In violation of Plaintiff's rights under Section 1985 and pursuant to the constitutional prohibitions under the 8th Amendment, Plaintiff

(58)

has been experiencing retaliation and deprivation of medical treatment from a number of Correctional Medical Services (CMS, Inc.) personnel as a result of his grievances and outside Court actions. Plaintiff contends that he has made several complaints to CMS and DOC superiors regarding the misconduct, negligence, actions, inactions, and denial of medical treatment by Nurse Quani Neal over this past year. Nurse Neal has clearly and verbally stated on several occasions why she denies the Plaintiff the treatment he's sought. Plaintiff specifically noted her indignantly saying: "You call yourself suing me, If it was up to me I wouldn't give you anything you ask For!" (She's even withheld doctor-prescribed meds, accusing Plaintiff of exaggerating his need of them). Nurse Neal has backed up her above statement because over the last year or so there has been negative temperatures between her and the Plaintiff. Especially for the commencement of this action which stemmed from the Plaintiff being deprived his doctor-prescribed Medical Diet and the realization that both DOC and CMS are not independently retaliating

(59)

against Plaintiff but they have conspired together to do so (due to his past internal and external complaints).

More recently (and more alarmingly), the Plaintiff has attached a handwritten copy of a grievance he submitted which explains how Dr. Louise Desrosiers put him on a medication that was discontinued nearly (2) years ago due to his bad reaction from it. Plaintiff told Dr. Desrosiers that NP Sherrel Ott had given him the med Cafergot already and discontinued it due to it sickening him. Dr. Desrosiers gave it to Plaintiff in spite of his warning, but since she discontinued Plaintiff's pain meds once Plaintiff got one of his migraines, he had no other choice but to obey the doctor's orders. He was in pain.

The Cafergot once again caused Plaintiff to become very ill and bed-ridden.

Plaintiff submitted a sick-call slip which alerted nurses (Quani who usually handles the sick-calls) that Plaintiff was nausea, unable to eat, weary and weak with a severe migraine, (I wrote that I took the Cafergot as prescribed and ever since then I was sickened). Plaintiff

(60)

submitted the sick-call on 9/26/07 and was
not seen until (2) weeks later (the handwritten
copy of that sick-call is attached). Quani Neal
at that point referred Plaintiff to the doctor
and that's when Plaintiff was instructed
by a "Dr. Lisa" to cease taking the Cafergot
and informed Plaintiff of a new medicine
she would give him for migraines and
related illnesses. (10/9/07 Plaintiff saw "Dr. Lisa").
That very same early eve//late noon Quani gave
a card of Cafergot to Plaintiff anyway.
    Plaintiff is attaching a "Medication Administration"
Record from November 2005, pointing out to the
Cart where it says "Cafergot" 2 tabs by
mouth for 30 days. Start: 11/4/05. Stop: 12/4/05.
Due to Plaintiff having adverse reactions from
it it was marked "D/C" on the 6th day.
D/C means discontinued. Because Dr. Desrosiers
knew Plaintiff's past experience with Cafergot
(Plaintiff told her also) he has no choice but
to believe she deliberately took away his
Pain meds and gave him Cafergot to make
him suffer. Plaintiff is seeking preliminary injunctive

(61)

relief based on the facts in this claim, as well as his other claims — especially those related to retaliation / Section 1985 claims.

## Relief Sought

As to claims 1 thru 10, Plaintiff is seeking compensatory and punitive damages in amounts to be determined by the jury and/or Judge after trial.

Respectfully Submitted,

Dated: 10/18/07

Lou G. Price, Sr.
SBI # 454309
DCC - Smyrna, De
19977

## Certificate of Service

I, _Lou G. Price, Sr._, hereby certify that I have served a true

and correct cop(ies) of the attached: _Amended Memorandum of Law In Support_

_of Plaintiffs 1983 and 1985 Cv Rights Complaint_ upon the following

parties/person (s):

TO: _U.S. Dist Court of Del._
_07-380-SLR_
_844 N. King St / Box 18_
_Wilmington De._
_19801_

TO: _Mrs. Lorenza Wolhar, Esq._
_1220 N. Market_
_P.O. Box 8888_
_Wilmington, De._
_19899-8888_

TO: _Ms. Erika Y. Tross, Esq._
_Dept. of Justice / De._
_820 N. French St._
_Wilmington, De._
_19801_
_Civil Division_

TO: _Ralph K. Durstein, Esq._
_Dept. of Justice / De._
_820 N. French St_
_Wilm, De_
_19801_
_Civil Division_

**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE  19977.

On this _____ day of _____, 2007

_____